UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ALEXANDER DIMITRIJEVIC, | § § § | |
| *Plaintiff,* | § § | |
| vs. | § § | CIVIL ACTION H-04-3457 |
| TV&C GP HOLDING INC., | § § § | |
| *Defendant.* | § § | |

## MEMORANDUM AND ORDER

Before the court is plaintiff Alexander Dimitrijevic's motion to compel answers to interrogatories (Dkt. 16) in this employment discrimination case, which has been referred to this magistrate judge for pre-trial management. The motion is granted in part and denied in part.

On March 16, 2005, Dimitrijevic served a set of interrogatories on defendant TV&C GP Holding Inc. ("Tyco") consisting of thirteen numbered questions and 122 separately lettered subparts. Tyco responded on April 25, answering the first five numbered interrogatories and 47 of the separately lettered subparts, but declining to answer the remainder as exceeding the federal limit of 25 interrogatories. *See* FED. R. CIV. P. 33(a); S.D. TEX. LOC. R. 33.1. Dimitrijevic moves to compel Tyco to answer the remaining interrogatories, contending that the subparts seek information closely related to the main interrogatory, and therefore are not separate questions to be counted toward the numerical limit.

Federal Rule of Civil Procedure 33(a) provides that, absent leave of court or written stipulation, interrogatories are not to exceed 25 in number, "including all

discrete subparts." *See* FED. R. CIV. P. 33(a).[1] Dimitrijevic obtained neither written stipulation nor leave of court, so the applicable limit is 25.

However, counting to 25 is not always easy, as this case illustrates. The source of the difficulty is ascertaining when to count a subpart as a separate interrogatory. The rule does not define the term "discrete subparts." *See Krawczyk v. City of Dallas*, No. Civ. 3:030CV-0584D, 2004 WL 614842, at *2 (N.D. Tex. Feb. 27, 2004). The Advisory Committee briefly addressed the issue in the notes accompanying the text of Rule 33(a):

> Parties cannot evade this presumptive limitation through the device of joining as "subparts" questions that seek information about discrete separate subjects. However, a question asking about communications of a particular type should be treated as a single interrogatory even though it requests that the time, place, persons present, and contents be stated separately for each such communication.

FED. R. CIV. P. 33(a) advisory committee notes to 1993 Amendment.

Except for interrogatories asking about "communications of a particular type," the Advisory Committee actually provides little guidance for distinguishing between "discrete" subparts, separately countable, from "non-discrete" subparts, which are not. No general test or formula is offered to assist courts in determining when a particular subpart is merely a device to evade the numerical limit. Nor have the courts been very successful in devising a uniform approach to the problem. *See generally, Safeco of America v. Rawstron*, 181 F.R.D. 441, 444-45 (C.D. Cal. 1998)

---

[1] Local Rule 33.1 largely mirrors the federal rule, although it omits the modifier "discrete." S.D. TEX. LOC. R. 33.1 ("No more than twenty-five interrogatories (counting sub-parts) may be served without leave of court."). Whether intentional or not, this difference in phrasing cannot be construed to impose a greater restriction on interrogatories than Rule 33(a), because local rules cannot alter the federal discovery rules in this respect. *See* FED. R. CIV. P. 26(b)(2) advisory committee notes to 2000 Amendment, at ¶ 29-30; *St. Paul Fire & Marine Ins. Co. v. Birch, Stewart, Kolasch & Birch, LLP*, 217 F.R.D. 288, 289 (D. Mass. 2003).

2

(gathering cases).

Understandably, the parties approach this question from polar extremes. Dimitrijevic argues that a subpart is not "discrete" and thus not countable if it shares a "common theme" with its primary, numbered interrogatory. *See* 8A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2168.1, at 261 (2d ed. 1994) ("It would appear that an interrogatory containing subparts directed at eliciting details concerning the common theme should be considered a single question, although the breadth of an area inquired about may be disputable."). Dimitrijevic alternatively describes this as the "logically and necessarily related" test. *See* 7 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 33.30[2] (3d ed. 1997) ("The better view is that subparts may be counted as part of one interrogatory if they are logically and necessarily related to the primary question."). Thus, he argues that the eight subparts of Interrogatory No. 6 are logically related and share the common theme of how sales orders are physically processed at the warehouse.[2] Unsurprisingly, Dimitrijevic contends that **each** of his listed subparts share a common theme with the primary question, and therefore **none** should be counted as a separate question.

And that is precisely the problem with the "common theme" test: almost never will it yield a separately countable, discrete subpart. All subparts can be said to share a theme with the primary question; otherwise they would not really be a "subpart." Any mildly creative lawyer can invent a rubric sufficiently elastic to cover the most disparate of topics: Dimitrijevic's first 12 numbered interrogatories could just as

---

[2] The Interrogatories are set forth in Appendix A.

easily be redesignated as subparts of a single interrogatory under the common theme of "liability." The "logically and necessarily related" formula has essentially the same flaw because, as the Supreme Court has observed in another context, "everything is related to everything else." *See California Div. of Labor Standards Enf. v. Dillingham,* 519 U.S. 314, 335 (1997) (Scalia, J., concurring) (discussing ERISA preemption of state laws which "relate to" ERISA benefit plans); *New York Conf. of Blue Cross v. Travelers Ins. Co.,* 514 U.S. 645, 655 (1995) ( "If 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes preemption would never run its course, for 'really, universally, relations stop nowhere' . . .." (citation omitted)). In short, neither the common theme nor the logical relationship formulas are particularly useful in drawing the line on the slippery slope between subparts which are 'discrete' and those which are not. Either formula invites evasion of the presumptive limitation on interrogatories under Rule 33(a), thereby defeating the purpose of the 1993 amendments.

Tyco's proposed test is skewed in the opposite direction. Tyco would focus on whether the subpart "introduces a new topic that is in a distinct field of inquiry." *See Banks v. Office of the Senate Sergeant at Arms,* 222 F.R.D. 7, 10 (D.D.C. 2004). Of course, any given topic may encompass distinct fields of inquiry, and yet be intimately related to other topics. In the communication example given by the Advisory Committee, the four specified aspects of the communication ("time, place, persons present, and contents") could fairly be classified as four distinct "fields of inquiry," yet the Committee would count them as a single interrogatory. Everything depends on how narrowly or broadly the term "distinct field of inquiry" is construed. Tyco would apply the term so narrowly that **all** listed subparts become separate

4

interrogatories. Because Tyco's proposed test merely substitutes one vague phrase ("distinct field of inquiry") for another ("discrete subparts"), it offers little practical guidance here.

However, Tyco points to an alternative test which holds more promise. In *Kendall v. GES Exposition Services, Inc.,* 174 F.R.D. 684 (D. Nev. 1997), the court held that interrogatory subparts are to be counted as discrete subparts unless they are "logically or factually subsumed within and necessarily related to the primary question." *Id.* at 686. A recent district court decision added a helpful gloss: "***If the first question can be answered fully and completely without answering the second question***, then the second question is totally independent of the first and not 'factually subsumed within [it].'" *Krawczyk*, 2004 WL 614842, at *2 (emphasis added). This "full and complete answer" standard, although still somewhat imprecise, has two distinct advantages over the other tests discussed. First, it is the same standard already employed by the federal rules to measure the sufficiency of interrogatory answers. *See* FED. R. CIV. P. 33(b) ("Each interrogatory shall be answered separately and fully…") and 37(a)(3) ("[A]n evasive or incomplete disclosure, answer, or response shall be treated as a failure to disclose, answer, or respond.") Enlisting this standard as a guide for counting interrogatory subparts has the virtue of Occam's razor—avoiding needless multiplication of legal standards. Case law delineating the contours of a "complete" interrogatory answer under Rule 37(a)(3) would help define a "countable" subpart under Rule 33(a), and vice versa.

The "full and complete answer" standard also has the virtue of common sense. If a full and complete answer to the primary question would necessarily encompass the specific information sought by the subpart, then there is no reason to separately

5

count the subpart. By explicitly listing the subpart, the proponent is not truly seeking additional information but merely giving notice of the type of information that a full and complete answer to the main question should contain. The proponent is already entitled to the information specified in the subpart by virtue of Rule 37(a)(3)'s completeness requirement. It would be unfair to penalize the proponent for simply making explicit his expectation of what should be incorporated within a proper response to the primary question. On the other hand, if the subpart seeks information beyond the scope of the primary question, then there is nothing unfair about separately counting it against the numerical limit.[3]

Although not always yielding bright lines, this "full and complete answer" standard is consistent with available precedent, as well as the views expressed by the Advisory Committee. When an interrogatory asks a party to describe or identify communications of a particular type, it is reasonable to expect a full and complete answer to include the "time, place, persons present, and content" for each such communication. Similarly, when an interrogatory seeks the identity of a witness, a full and complete answer would naturally include the person's name, address, telephone number, and perhaps other identifying information such as job title and employer. *See Bakhico Co. v. Shasta Beverages, Inc.*, No. Civ. 3:94-CV-1780-H, 1998 WL 249209, *3 (N.D. Tex. May 14, 1998) (giving name and phone number only was "not a very full identification of witnesses"). On the other hand, an interrogatory inquiring about an employer's general hiring practices is separate and distinct from

---

[3] This test does not provide useful guidance when the interrogatory contains implicit subparts "imbedded" within an overbroad main question. *See Safeco of America v. Rawstron*, 181 F.R.D. 441, 445 (C.D. Cal. 1998) (interrogatory asking for factual basis for denial of any of 50 requests for admission treated as discrete subparts). The interrogatories at issue here do not present this problem.

6

a subpart inquiring about a specific hiring decision, because the former can be answered fully and completely without addressing the latter. *Banks,* 222 F.R.D. at 11. Similarly, an interrogatory asking the reasons for the elimination of the plaintiff's job can be fully answered without naming the decision-makers, so a subpart seeking their identity should be counted separately. *Nyfield v. Virgin Islands Tel. Corp.,* 200 F. R. D. 246, 248 (D.V.I. 2001). For the same reason, "a demand for information about a certain event and for the documents about it should be counted as two separate interrogatories." *Banks,* 222 F.R.D. at 9.

It should be emphasized that the "full and complete answer" standard involves comparison between the primary question and its subpart, not (as Tyco apparently contends) between one subpart and another. Dimitrijevic rightly points out that under such an approach an interrogatory would almost never have legitimate (i.e. uncountable) subparts, because a subpart nearly always seeks specific details fully answerable without reference to other subparts. *Cf. Kendall v. GES Exposition Services, Inc.,* 174 F.R. D. 684, 686 (D. Nev. 1997) (analyzing "whether the first question is primary and subsequent are secondary to the primary question.").

With this standard in mind, we turn to the interrogatories at hand. A summary review of the 13 numbered questions and 122 separately lettered subparts plainly reveals that Dimitrijevic has exceeded the permissible limit. *See, e.g., Williams v. Board of County Commissioners,* 192 F.R.D. 698, 701-02 (D. Kan. 2000) (finding, after summary review of interrogatories containing 117 subparts, that numerical limit was exceeded and that plaintiff need not answer interrogatories as propounded). For example, Interrogatory No. 1 contains at least seven different questions; the primary question deals with "all reasons supporting a case for reduction in force at the

7

warehouse," while each of the subparts (except for subpart f) seeks specified information which may or may not have supported a reduction in force. *See, e.g.,* Interrogatory No. 1.d. ("information on increase or decline in business orders"). The primary question could certainly be fully answered without disclosing the information sought by these subparts. Likewise, Interrogatory No. 8 contains 17 discrete subparts, asking not only about the general selection process for warehouse foreman, but also details on the selection of six named individuals. Even assuming the other numbered interrogatories contained no discrete subparts (which is not the case), Dimitrijevic's interrogatories exceed the maximum permitted by Rule 33(a).

Having found these interrogatories in violation of Rule 33(a), the next question is the appropriate remedy. The choice is whether to permit resubmission of another set of interrogatories conforming to the numerical limit, or simply to require answers to the first 25 questions (properly counted) of the existing set.[4] "Since service of more than 25 interrogatories is not permitted, the entire set of interrogatories is impermissible. Respondent can either object to the set as a whole or object to the excess." THE HON. DAVID HITTNER, ET AL., RUTTER GROUP PRACTICE GUIDE: FEDERAL CIVIL PROCEDURE BEFORE TRIAL § 11:1695 (5th Cir. ed. 2005); s*ee also Traina v. Blanchard*, No. Civ. A. 97-0348, 1998 WL 483485, *4 (E.D. La. April 15, 1998) (entire set objectionable). Here, Tyco has responded to the first five numbered interrogatories[5] and objected to the balance on numerosity grounds. For this reason,

---

[4] One authority has suggested that the responding party might be allowed to pick and choose which 25 interrogatories to answer, but no reported case has adopted this approach. THE HON. DAVID HITTNER, ET AL., RUTTER GROUP PRACTICE GUIDE: FEDERAL CIVIL PROCEDURE BEFORE TRIAL § 11:1695 (5th Cir. ed. 2005).

[5] Dimitrijevic has not challenged the sufficiency of these answers by Tyco.

8

as well as the fact that the discovery deadline has now passed, it would be inappropriate to permit Dimitrijevic the opportunity to propound a reformulated set of interrogatories. Accordingly, the court will undertake to determine whether Tyco has indeed answered 25 interrogatories, and if not, to determine how many more questions must be answered to reach that limit.

What follows is the court's tally of discrete subparts contained in the 5 interrogatories answered by Tyco:

Interrogatory No. 1:

As explained above, this interrogatory consists of seven separate questions. Subpart f ("any other reason(s) for reduction in force") is redundant in light of the main question.

Interrogatory No. 2:

This interrogatory contains four separate questions. The main question asks about training sessions on workplace harassment, and subparts a-f, h, and j-n seek information that a complete answer to the main question would entail: dates, duration, speaker, subject matter, attendees. Subparts g, i, and o deal with the existence of specific documents, and therefore constitute discrete subparts as explained in *Banks*, 222 F.R.D. at 10.

Interrogatory No. 3:

This interrogatory, seeking information about Dimitrijevic's termination meeting, contains at least two separate questions. Subparts a-c and e-f ask about meeting details which a complete answer would provide: time, duration, location, and what was said. Subpart d concerns documents, which is a separate question. Subparts g and h, asking about "other" conversations, acts, and information, are

9

somewhat vague and arguably countable as separate questions. But it is more fitting to consider these subparts as mere gap-fillers that are subsumed within the main question.

<u>Interrogatory No. 4:</u>

This interrogatory seeks a description of the organizational structure of the human resource office in Houston, and contains four separate questions. Subparts a-f seek the name, title and functions of various persons in that office, all of which information would be contained within a full response to the main question. Subparts g, h, and i each seek discrete information which is not limited to the Houston office, and therefore each counts as a separate question.

<u>Interrogatory No. 5:</u>

This interrogatory, which essentially asks for a detailed map of the warehouse, counts as a single question. Each subpart inquires about the physical location of persons and things within the warehouse, all of which would be included on a complete warehouse diagram.

Properly counting all discrete subparts, therefore, Tyco has answered 18 interrogatories to date. Dimitrijevic is therefore entitled to answers to the next seven interrogatories.

As it happens, the next interrogatory (No. 6) contains at least seven discrete subparts. Subparts a and b would be included in a complete answer to the main question dealing with the "physical process of how sales orders for valves and flow control products at the warehouse are retrieved, assembled, and packaged." Subparts c-h each seek discrete information, such as the names of individual technicians, particular tools, decision-makers, and frequency of job assignments. Tyco will satisfy

10

its obligation under the discovery rules by providing full and complete answers to Interrogatory No. 6 and all of its designated subparts. The remainder of the interrogatories need not be answered.

The jurisprudence of interrogatory counting is as imprecise as it is tedious. Reasonable minds may certainly disagree on where the lines should be drawn, but the rule presupposes such lines and gives the court the discretion to draw them. Parties are well advised to avoid risking an unfavorable court count by either seeking leave of court in advance or negotiating a written stipulation from the other side. Neither course was followed here, and so it is

ORDERED that Plaintiff's motion to compel (Dkt. 16) is granted in part and denied in part. Tyco is ordered to provide full and complete answers to Interrogatory No. 6 and all its subparts by close of business on September 1, 2005. All other requested relief is denied.

Signed on August 24, 2005, at Houston, Texas.

_____
Stephen Wm Smith
United States Magistrate Judge

# **APPENDIX A**

INTERROGATORY NO. 1:

1. State all reasons supporting a case for reduction in force at the warehouse in connection with discharge of Dimitrijevic and other employees at the warehouse in May 2003, including:

    a. decline in business or profit for the years of 2001, 2002, 2003 or such projection for 2004;
    b. studies, evaluations, or projections of needs of the workforce for 2001, 2002, 2003, and 2004;
    c. customer contractions or expansion, including termination or modification of contracts with Tyco;
    d. information on increase or decline of business orders;
    e. any labor costs study, evaluation, or analysis of workforce at the warehouse;
    f. any other reason(s) for the reduction in force; and
    g. identify all documents that reflect or support reduction in force in May 2003.

INTERROGATORY NO. 2:

2. Describe any training or instructional setting in which employees at the warehouse attended to discuss or receive information or instruction on work harassment, including what the law is, how to behave, how to avoid problems, or any such similar coaching or teaching, including for each of such meeting:

    a. when the meeting was held;
    b. who attended the meeting;
    c. who gave the instruction;
    d. the subject matter of the instruction;
    e. how long the instruction lasted;
    f. whether the meeting involved discussion;
    g. whether there was a sign up sheet for the meeting;
    h. whether it was in connection with any other meeting;
    i. whether any literature was given out to the attendees;
    j. whether Paul Austin attended the meeting;
    k. whether Emit Hosford attended the meeting;
    l. whether Sean Wolfe attended the meeting;
    m. whether Dimitrijevic attended the meeting;
    n. whether Rudy Lopez attended the meeting; and
    o. whether any notes were taken by the employees.

INTERROGATORY NO. 3:

3. On the day of discharge of Dimitrijevic, explain the facts and circumstances regarding his termination, including:

    a. when the meeting was held;
    b. what was said to Dimitrijevic at the time of termination and who said it;
    c. how long the meeting lasted;
    d. whether any documents were given to Dimitrijevic;
    e. where the termination meeting took place;
    f. what Dimitrijevic said to those present at the meeting;
    g. any other conversation or act took place; and
    h. any other information provided by Tyco or received by Tyco not discussed from subparts a-g.

INTERROGATORY NO. 4:

4. Describe the organizational structure and functions of human resource office in Houston, which is responsible for providing personnel-related services to employees at the warehouse, including:

    a. the person who is head of the human resource office in Houston;
    b. the name, title and functions of the person(s) to whom the head human resource person in Houston reports;
    c. the name, title and functions of another human resource personnel to whom the head of the human resource office in Houston reports;
    d. the location of the person to whom the head of the Houston human resource office reports;
    e. the names, titles, and descriptions of all managers and supervisors reporting to the person who is the head of the Houston human resource office;
    f. all functions performed by the head of the Houston human resource office;
    g. identify any particular person or persons with the human resource office who ordinarily handles or coordinates the function of identifying employees who are subject to reduction in cost;
    h. identify any particular person or persons with the human resource office who ordinarily handles or coordinates the persons who handle work harassment and related issues; and
    i. identify any particular person or persons with the human resource office who ordinarily handles or coordinates the toll free 1-800- number that handles employee complaints.

INTERROGATORY NO. 5:

5. Describe the physical locations or various parts of the warehouse as of May 1, 2003, including the locations of the offices, lockers, the break room, valve automated center, and whether the inventories are kept, including:

   a. where Paul Austin's office/desk was located;
   b. where Emit Hosford's office/desk was located;
   c. where Sean Wolfe's office/desk was located;
   d. where Dimitrijevic's desk was located on January 1, 2003;
   e. where Dimitrijevic's desk was located as of May 1, 2003;
   f. where valve automated center is located in relationship to the offices of the supervisor/foreman;
   g. where the break room is located; and
   h. where the inventories are kept at the warehouse relative to the employees' offices.

INTERROGATORY NO. 6:

6. Explain the physical process of how sales orders for valves and flow control products at the warehouse are retrieved, assembled, and packaged in connection with the valve automated center as of May 1, 2003, including:

   a. describe types of sales order to be filled daily by Tyco from end users and distributors;
   b. explain the general types of sales orders or equipment that requires assembly;
   c. names of individual technicians who were capable of assembling the sales orders referred to in subpart b.;
   d. name the types of tools and machinery used and required by technicians for assembly as referred to in subpart b.;
   e. describe who pulls the parts from the warehouse, whether technician, laborer, or temporary worker;
   f. state whether a walkie-talkie is assigned to each technician;
   g. describe who decides which technician fill which purchase order; and
   h. describe whether the job assignment occurs daily.

INTERROGATORY NO. 7:

7. Describe and explain the assignment of various brand names of inventories kept by Tyco at the warehouse and how the brand names would be assigned to technicians, including:

   a. names of top fifteen (15) primary products (determined by brand names and quantity of annual sales for past four years) held at the warehouse as of May 1, 2003;

14

    b.    identify the names of technicians assigned to each of the brand names as of May 1, 2003;
    c.    identify all of the brand names of inventory or products that Dimitrijevic was responsible to handle while he was an employee;
    d.    the brands of valves that Dimitrijevic assembled as of January 1, 2003;
    e.    the brands of valves that Dimitrijevic assembled as of May 1, 2003;
    f.    explain and describe whether Sean Wolfe, Eddie Key, and Mark Gullet were cross-trained on any KTM products during April and May of 2003;
    g.    explain whether any other technicians other than those named in subpart f. were cross-trained for KTM, Decote, and MCF brands in April-May of 2003; and
    h.    explain if Dimitrijevic was cross-trained to assemble and/or handle any new or different brand names with which he did not have experience prior to January 1, 2003.

<u>INTERROGATORY NO. 8:</u>

8.    Describe how the supervisors, foremen, and/or lead persons for the Tyco warehouse were selected or appointed, including:

    a.    what factors were considered in selecting Paul Austin as the supervisor;
    b.    what factors were considered in appointing Emit Hosford as the foreman;
    c.    what factors were considered in selecting Sean Wolfe as the lead person;
    d.    persons involved in selecting Austin as the manager of the warehouse;
    e.    persons involved in selecting Hosford as a foreman;
    f.    persons involved in selecting Wolfe as a lead person;
    g.    whether a meeting was held to decided on either Austin, Wolfe, or Hosford would receive an appointment or selection and if so who attended the meeting;
    h.    name all persons who gave approval for the appointment of Austin and Hosford as a supervisor and foreman, respectively;
    i.    whether any memo or letter was written in connection with the appointment of Austin, Wolfe, or Hosford;
    j.    describe what factors were involved in appointment of Raymond Cooper as a lead person (or however his title or position is described);
    k.    describe Raymond Cooper's background;
    l.    describe factors involved in the appointment of Jeff Lacomb as a lead person (or however his position was described);
    m.    describe Lacomb's experience and background, including previous employment experience at Tyco;
    n.    name and describe any other person who was named as a lead person during the same period of time Dimitrijevic worked at the warehouse;

  o. describe factors involved in transfer of Dana Evan Leach to the warehouse; and

  p. describe Mr. Leach's previous experience and background, including his experience at Tyco.

INTERROGATORY NO. 9:

9. Describe the reduction in workforce process of May 2003 in which Dimitrijevic was terminated, including:

  a. the names and titles of person involved in the decision making;
  b. the name and title of the ultimate decision maker;
  c. when the decision was made;
  d. whether any decisions made through a meeting and if so, who was at the meeting;
  e. describe or state all considerations and factors involved in deciding the cause or need for a workforce reduction at the warehouse;
  f. whether any memo was generated in connection with the reduction in force before or after the event of reduction in force;
  g. whether any replacement workers were hired subsequent to the reduction in force;
  h. how any replacement workers were selected;
  i. the persons involved in the decision making of hiring replacement workers; and
  j. persons involved in hiring of employees at the warehouse to replace Dimitrijevic after he was terminated, including the final decision maker.

INTERROGATORY NO. 10:

10. Describe Tyco's business operation in Houston area, including:

  a. names of all Tyco's and its subsidiaries operating in Harris county and other counties in which Tyco and its subsidiaries are subject to jurisdiction of the U.S. District Court, Southern District;
  b. describe the nature or type of business in sufficient detail with respect to the operations in Houston area for the companies named in subpart a.;
  c. describe and explain in sufficient detail the revenues earned from each company's business operations in Houston area for the companies named in subpart a.;
  d. describe the number of employees, contract workers, and other extent of manpower in the Houston area for the companies named in subpart a.; and
  e. describe by cost or fair market value the assets and real and personal property located in the Houston area for the companies named in subpart a.

INTERROGATORY NO. 11:

11. Describe and explain the history of Dimitrijevic's salary, bonus, and other employee benefits he had accrued or experienced with Tyco, and including:

   a. his salary per annum at the time of his termination;
   b. his salary for each year of the four years preceding his termination;
   c. his annual pay increases of the five years preceding his termination;
   d. his bonuses received for the termination year and four years preceding his termination;
   e. his 401K annual contributions for the five years preceding his termination;
   f. his 401K annual contributions matched by the company for the five years preceding his termination;
   g. his health insurance premiums paid by the company for the five years preceding his termination;
   h. his other insurance premiums, including health and accident premiums, paid by Tyco for the five years preceding his termination;
   i. his vacation and holidays benefits paid by Tyco for the five years preceding his termination; and
   j. all other benefits, including fringe benefits, paid by Tyco for the five years preceding the termination.

INTERROGATORY NO. 12:

12. Explain and describe how Hispanic employees' complaints lodged in connection with toll free concern line, 1-800-714-1994, were investigated and handled, as referred in Plaintiffs Original Petition, ¶ 31 and including:

   a. name and title of all persons involved in the investigation;
   b. describe all meetings held in connection with the complaint;
   c. describe who attended each meeting, the substances of the discussions, when the meetings occurred, and whether any memos were generated;
   d. name all persons who were interviewed in connection with the complaint;
   e. state or describe whether any statement was obtained from any individual employee, including any supervisor or manager;
   f. state whether any meetings were held by human resource department in connection with the complaint and describe for such meetings, who attended, when and where it was held, and the substance of the discussions;
   g. state whether any particular company procedure was followed with regard to 1-800-714-1994 concern complaint;
   h. state whether any voice recording was made in connection with 1-800-714-1994 complaint and identify the location of the recordings;

      i. state and describe whether any assistance was sought from corporate headquarters with regard to the complaint and description of the assistance;
      j. name and title of all person involved in the decision making process of the conclusion involved in subpart j.;
      k. state and describe any evaluation or analysis of the complaint filed;
      l. describe whether any conclusion was reached with regard to the complaint filed;
      m. whether any letter or memo was written in connection with the resolution of the event regarding the complaint filed;
      n. provide a brief description of any memo/letter in connection with item discussed in subpart m. and identify any person copied in the memo; and
      o. identify all documents generated in connection with the concern line complaint.

<u>INTERROGATORY NO. 13:</u>

13. State Tyco's total wealth or its worth of all assets owned as of December 31, 2003 and including:

      a. its total value of all assets, whether tangible, intangible, personal property, and real property as shown on its audited, consolidated financial balance sheet reported to its shareholders on its annual report;
      b. its annual gross income for fiscal year 2003 as shown on its audited income statement to its shareholders; and
      c. the total value of its net worth (total assets less all liabilities as shown on its balance sheet and reported to its shareholders) as of December 31, 2003.